MARTIN, DIRECTOR, MICHIGAN DEPARTMENT OF
CORRECTIONS, ET AL. *v.* HADIX ET AL.

No. 98–262.   Argued March 30, 1999—Decided June 21, 1999

344

O'CONNOR, J., delivered the opinion of the Court, in which REHN-QUIST, C. J., and KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined, in which SCALIA, J., joined as to all but Part II–B, and in which STEVENS and GINSBURG, JJ., joined as to Parts I, II–A–1, and II–B–1. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 362. GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 364.

*Thomas L. Casey*, Solicitor General of Michigan, argued the cause for petitioners. With him on the briefs were *Jennifer M. Granholm*, Attorney General, *Frank J. Kelley*, former Attorney General, and *Leo H. Friedman* and *Mark W. Matus*, Assistant Attorneys General.

*Deborah LaBelle* argued the cause for respondents. With her on the brief was *Jeffrey D. Dillman*.*

---

*A brief of *amici curiae* urging reversal was filed for the State of Ohio et al. by *Betty D. Montgomery*, Attorney General of Ohio, and *Stuart W. Harris* and *Todd R. Marti*, Assistant Attorneys General, by *L. A. Prager*, Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Robert H. Kono* of Guam, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Jim Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Tom Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Scott Harshbarger* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Peter Verniero* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *John Knox Walkup* of Tennessee, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Mark L. Earley* of Virginia, *Christine O. Gregoire* of Washington, and *Darrell V. McGraw* of West Virginia.

*Elizabeth Alexander, Donna H. Lee, Eric Balaban, Steven R. Shapiro*, and *Kary L. Moss* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

JUSTICE O'CONNOR delivered the opinion of the Court.*

Section 803(d)(3) of the Prison Litigation Reform Act of 1995 (PLRA or Act), 110 Stat. 1321–72, 42 U. S. C. § 1997e(d)(3) (1994 ed., Supp. III),† places limits on the fees that may be awarded to attorneys who litigate prisoner lawsuits. We are asked to decide how this section applies to cases that were pending when the PLRA became effective on April 26, 1996. We conclude that § 803(d)(3) limits attorney's fees with respect to postjudgment monitoring services performed after the PLRA's effective date but it does not so limit fees for postjudgment monitoring performed before the effective date.

I

The fee disputes before us arose out of two class action lawsuits challenging the conditions of confinement in the Michigan prison system. The first case, which we will call *Glover*, began in 1977 when a now-certified class of female prisoners filed suit under Rev. Stat. § 1979, 42 U. S. C. § 1983, in the United States District Court for the Eastern District of Michigan. The *Glover* plaintiffs alleged that the defendant prison officials had violated their rights under the Equal Protection Clause of the Fourteenth Amendment by denying them access to vocational and educational opportunities that were available to male prisoners. They also claimed that the defendants had denied them their right of access to the courts. After a bench trial, the District Court found "[s]ignificant discrimination against the female prison population" in violation of the Equal Protection Clause, *Glover* v. *John-*

---

*For the reasons stated in his separate opinion, JUSTICE SCALIA joins Parts I, II–A, and II–C of this opinion. For the reasons stated in JUSTICE GINSBURG's separate opinion, she and JUSTICE STEVENS join Parts I, II–A–1, and II–B–1 of this opinion.

†Subsection (d) of § 803(d) is the fee provision we consider today, and is codified at 42 U. S. C. § 1997e(d). Although that provision is technically § 803(d)(d) of the PLRA, like the parties, we refer to it simply as § 803(d) of the PLRA.

*son,* 478 F. Supp. 1075, 1083 (1979), and concluded that the defendants' policies had denied the *Glover* plaintiffs their right of meaningful access to the courts, *id.,* at 1096–1097. In 1981, the District Court entered a "Final Order" detailing the specific actions to be undertaken by the defendants to remedy the constitutional violations. *Glover* v. *Johnson,* 510 F. Supp. 1019 (ED Mich.). One year later, the court found that the plaintiffs were "prevailing parties" and thus entitled to attorney's fees under 42 U. S. C. § 1988 (1994 ed. and Supp. III). *Glover* v. *Johnson,* Civ. Action No. 77–71229 (ED Mich., Feb. 2, 1982), App. 103a.

In 1985, the parties agreed to, and the District Court entered, an order providing that the plaintiffs were entitled to attorney's fees for postjudgment monitoring of the defendants' compliance with the court's remedial decrees. *Glover* v. *Johnson,* No. 77–71229 (ED Mich., Nov. 12, 1985), App. 125a (Order Granting Plaintiffs' Motion for System for Submission of Attorney Fee). This order also established the system for awarding monitoring fees that was in place when the present dispute arose. Under this system, the plaintiffs submit their fee requests on a semiannual basis, and the defendants then have 28 days to submit any objections to the requested award. The District Court resolves any disputes. *Ibid.* In an appeal from a subsequent dispute over the meaning of this order, the Court of Appeals for the Sixth Circuit affirmed that the plaintiffs were entitled to attorney's fees, at the prevailing market rate, for postjudgment monitoring. *Glover* v. *Johnson,* 934 F. 2d 703, 715–716 (1991). The prevailing market rate has been adjusted over the years, but it is currently set at $150 per hour. See *Hadix* v. *Johnson,* 143 F. 3d 246, 248 (CA6 1998) (describing facts of *Glover*).

The second case at issue here, *Hadix,* began in 1980. At that time, male prisoners at the State Prison of Southern Michigan, Central Complex (SPSM–CC), filed suit under 42 U. S. C. § 1983 in the United States District Court for

the Eastern District of Michigan claiming that the conditions of their confinement at SPSM–CC violated the First, Eighth, and Fourteenth Amendments to the Constitution. Five years later, the *Hadix* plaintiffs and the defendant prison officials entered into a consent decree to "'assure the constitutionality'" of the conditions of confinement at SPSM–CC. *Hadix* v. *Johnson,* 144 F. 3d 925, 930 (CA6 1998) (quoting consent decree). The consent decree, which was approved by the District Court, addressed a variety of issues at SPSM–CC, ranging from sanitation and safety to food service, mail, and access to the courts.

In November 1987, the District Court entered an order awarding attorney's fees to the *Hadix* plaintiffs for postjudgment monitoring of the defendants' compliance with the consent decree. *Hadix* v. *Johnson,* No. 80–CV–73581 (ED Mich., Nov. 19, 1987), App. 79a. Subsequently, the *Hadix* plaintiffs were awarded attorney's fees through a procedure similar to the procedure that had been established for the *Glover* plaintiffs: The plaintiffs submitted semiannual fee requests, the defendants filed timely objections to these requests, and the District Court resolved any disputes. The District Court set, and periodically adjusted, a specific market rate for the fee awards; by 1995, that rate was set at $150 per hour for lead counsel. See *Hadix* v. *Johnson,* 65 F. 3d 532, 536 (CA6 1995).

Thus, by 1987, *Glover* and *Hadix* were on parallel paths. In both cases, the District Court had concluded that the plaintiffs were entitled to postjudgment monitoring fees under 42 U. S. C. § 1988, and the parties had established a system for awarding those fees on a semiannual basis. Moreover, in both cases, the District Court had established specific market rates for awarding fees. By the time the PLRA was enacted, the prevailing market rate in both cases had been set at $150 per hour.

The fee landscape changed with the passage of the PLRA on April 26, 1996. The PLRA, as its name suggests, con-

tains numerous provisions governing the course of prison litigation in the federal courts. It provides, for example, limits on the availability of certain types of relief in such suits, see 18 U. S. C. § 3626(a)(2) (1994 ed., Supp. III), and for the termination of prospective relief orders after a limited time, § 3626(b). The section of the PLRA at issue here, § 803(d)(3), places a cap on the size of attorney's fees that may be awarded in prison litigation suits:

"(d) Attorney's fees

"(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U. S. C. § 1988], such fees shall not be awarded, except to the extent [authorized here].

.        .        .        .        .

"(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U. S. C. § 3006A (1994 ed. and Supp. III)], for payment of court-appointed counsel." § 803(d), 42 U. S. C. § 1997e(d) (1994 ed., Supp. III).

Court-appointed attorneys in the Eastern District of Michigan are compensated at a maximum rate of $75 per hour, and thus, under § 803(d)(3), the PLRA fee cap for attorneys working on prison litigation suits translates into a maximum hourly rate of $112.50.

Questions involving the PLRA first arose in both *Glover* and *Hadix* with respect to fee requests for postjudgment monitoring performed *before* the PLRA was enacted. In both cases, in early 1996, the plaintiffs submitted fee requests for work performed during the last half of 1995. These requests were still pending when the PLRA became effective on April 26, 1996. In both cases, the District Court concluded that the PLRA fee cap did not limit attorney's fees for services performed in these cases prior to the effective

date of the Act.    *Glover* v. *Johnson,* Civ. Action No. 77–71229 (ED Mich., June 3, 1996), App. 148a; *Hadix* v. *Johnson,* Civ. Action No. 80–73581 (ED Mich., May 30, 1996), App. 91a. The Sixth Circuit affirmed this interpretation of the PLRA on appeal.    *Glover* v. *Johnson,* 138 F. 3d 229, 249–251 (1998); *Hadix* v. *Johnson,* 144 F. 3d, at 946–948.

Fee requests next were filed in both *Glover* and *Hadix* for services performed between January 1, 1996, and June 30, 1996, a time period encompassing work performed both before and after the effective date of the PLRA.    As relevant to this case, the defendant state prison officials argued that these fee requests were subject to the fee cap found in § 803(d)(3) of the PLRA, and the District Court accepted this argument in part.    In nearly identical orders issued in the two cases, the court reiterated its earlier conclusion that the PLRA does *not* limit fees for work performed *before* April 26, 1996, but concluded that the PLRA fee cap *does* limit fees for services performed *after* the effective date. *Hadix* v. *Johnson,* Case No. 80–73581 (ED Mich., Dec. 4, 1996), App. to Pet. for Cert. 27a; *Glover* v. *Johnson,* Case No. 77–71229 (ED Mich., Dec. 4, 1996), App. to Pet. for Cert. 33a.

The Court of Appeals for the Sixth Circuit consolidated the appeals from these orders, and, as relevant here, affirmed in part and reversed in part.    *Hadix* v. *Johnson,* 143 F. 3d 246 (1998).    According to the Court of Appeals, the PLRA's fee limitation does not apply to fee requests such as those in *Hadix* and *Glover* that relate to cases that were pending on the date of enactment.    If it were applied to pending cases, the court held, it would have an impermissible retroactive effect, regardless of when the work was performed. 143 F. 3d, at 250–256.

The Court of Appeals' holding—that the PLRA's attorney's fees provisions do not apply to pending cases—is inconsistent with the holdings of other Circuits on these issues. For example, the Courts of Appeals for the Fourth and Ninth

Circuits have held that § 803(d) caps all fees that are ordered to be paid after the enactment of the PLRA, even when those fees compensate attorneys for work performed prior to the enactment of the PLRA. *Alexander S.* v. *Boyd*, 113 F. 3d 1373, 1385–1388 (CA4 1997), cert. denied, 522 U. S. 1090 (1998); *Madrid* v. *Gomez*, 150 F. 3d 1030 (CA9 1998). See also *Blissett* v. *Casey*, 147 F. 3d 218 (CA2 1998) (PLRA does not necessarily limit fees when work performed before effective date but award rendered after effective date), cert. pending, No. 98–527; *Inmates of D. C. Jail* v. *Jackson*, 158 F. 3d 1357, 1360 (CADC 1998) (holding that PLRA limits fees for work performed after effective date of Act, and suggesting in dicta that it does not apply to work performed prior to effective date), cert. pending, No. 98–917. We granted certiorari to resolve these conflicts. 525 U. S. 1000 (1998). In this Court, the *Hadix* and *Glover* plaintiffs are respondents, and the defendant prison officials from both cases are petitioners.

## II

Petitioners contend that the PLRA applies to *Glover* and *Hadix*, cases that were pending when the PLRA was enacted. This fact pattern presents a recurring question in the law: When should a new federal statute be applied to pending cases? See, *e. g.*, *Lindh* v. *Murphy*, 521 U. S. 320 (1997); *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939 (1997). To answer this question, we ask first "whether Congress has expressly prescribed the statute's proper reach." *Landgraf* v. *USI Film Products*, 511 U. S. 244, 280 (1994). If there is no congressional directive on the temporal reach of a statute, we determine whether the application of the statute to the conduct at issue would result in a retroactive effect. *Ibid.* If so, then in keeping with our "traditional presumption" against retroactivity, we presume that the statute does not apply to that conduct. *Ibid.* See also *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, *supra*, at 946.

A

1

Congress has not expressly mandated the temporal reach of § 803(d)(3). Section 803(d)(1) provides that "[i]n any action brought by a prisoner who is confined [to a correctional facility] . . . attorney's fees . . . shall not be awarded, except" as authorized by the statute. Section 803(d)(3) further provides that "[n]o award of attorney's fees . . . shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U. S. C. § 3006A], for payment of court-appointed counsel." Petitioners contend that this language—particularly the phrase "[i]n *any* action *brought* by a prisoner who *is* confined," § 803(d)(1) (emphasis added)—clearly expresses a congressional intent that § 803(d) apply to pending cases. They argue that "any" is a broad, encompassing word, and that its use with "brought," a past-tense verb, demonstrates congressional intent to apply the fees limitations to *all* fee awards entered after the PLRA became effective, even when those awards were for services performed before the PLRA was enacted. They also contend that § 803(d)(3), by its own terms, applies to all "award[s]"—understood as the actual court order directing the payment of fees—entered after the effective date of the PLRA, regardless of when the work was performed.

The fundamental problem with all of petitioners' statutory arguments is that they stretch the language of § 803(d) to find congressional intent on the temporal scope of that section when we believe that § 803(d) is better read as setting *substantive* limits on the award of attorney's fees. Section 803(d)(1), for example, prohibits fee awards unless those fees were "directly and reasonably incurred" in the suit, and unless those fees are "proportionately related" to, or "directly and reasonably incurred in enforcing," the relief ordered. 42 U. S. C. § 1997e(d)(1) (1994 ed., Supp. III). Similarly, § 803(d)(3) sets substantive limits by prohibiting the award

of fees based on hourly rates greater than a specified rate. In other words, these sections define the substantive availability of attorney's fees; they do not purport to define the temporal reach of these substantive limitations. This language falls short of demonstrating a "clear congressional intent" favoring retroactive application of these fees limitations. *Landgraf*, 511 U. S., at 280. It falls short, in other words, of the "unambiguous directive" or "express command" that the statute is to be applied retroactively. *Id.*, at 263, 280.

In any event, we note that "brought," as used in this section, is not a past-tense verb; rather, it is the participle in a participial phrase modifying the noun "action." And although the word "any" is broad, it stretches the imagination to suggest that Congress intended, through the use of this one word, to make the fee limitations applicable to all fee awards. Finally, we do not believe that the phrase "[n]o award" in §803(d)(3) demonstrates congressional intent to apply that section to all fee awards (*i. e.*, fee payment orders) entered after the PLRA's effective date. Had Congress intended §803(d)(3) to apply to all fee orders entered after the effective date, even when those awards compensate for work performed before the effective date, it could have used language more obviously targeted to addressing the temporal reach of that section. It could have stated, for example, that "No award entered after the effective date of this Act shall be based on an hourly rate greater than the ceiling rate."

The conclusion that §803(d) does not clearly express congressional intent that it apply retroactively is strengthened by comparing §803(d) to the language that we suggested in *Landgraf* might qualify as a clear statement that a statute was to apply retroactively: "[T]he new provisions shall apply to all proceedings pending on or commenced after the date of enactment." *Id.*, at 260 (internal quotation marks omitted). This provision, unlike the language of the PLRA, unambiguously addresses the temporal reach of the statute.

With no such analogous language making explicit reference to the statute's temporal reach, it cannot be said that Congress has "expressly prescribed" §803(d)'s temporal reach. *Id.*, at 280.

2

Respondents agree that §803(d) of the PLRA lacks an express directive that the statute apply retroactively, but they contend that the PLRA reveals congressional intent that the fees provisions apply *prospectively* only. That is, respondents insist that the PLRA's fees provisions demonstrate that they only apply to cases filed after the effective date of the Act. For respondents, this congressional intent is evident from a study of the Act's structure and legislative history.

According to respondents, a comparison of §§802 and 803 of the PLRA leads to the conclusion that §803(d) should only apply to cases filed after its enactment. The attorney's fees provisions are found in §803 of the PLRA, and, as described above, this section contains no explicit directive that it should apply to pending cases. By contrast, §802— addressing "appropriate remedies" in prison litigation— explicitly provides that it applies to pending cases: "[This section] shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title." §802(b)(1), note following 18 U. S. C. §3626 (1994 ed., Supp. III). According to respondents, the presence of this express command in §802, when coupled with §803's silence, supports the negative inference that §803 is *not* to apply to pending cases. Respondents buttress this "negative inference" argument by reference to the legislative history of the fees provisions. Respondents contend that when the attorney's fees limitations were originally drafted, they were in the section that became §802 of the PLRA, which at the time contained language making them applicable to pending cases. Later, the fees provisions were moved to what be-

came § 803 of the PLRA, a section without language making it applicable to pending cases. Thus, according to respondents, when Congress moved the fees provisions out of § 802, with its explicitly retroactive language, it demonstrated its intent to apply the fees provisions *prospectively* only. Brief for Respondents 15–18.

Respondents' "negative inference" argument is based on an analogy to our decision in *Lindh* v. *Murphy*, 521 U. S. 320 (1997). In *Lindh*, we considered whether chapter 153 of the newly enacted Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, was applicable to pending cases. In concluding that chapter 153 does not apply to such cases, we relied heavily on the observation that chapter 154 of AEDPA includes explicit language making that chapter applicable to pending cases. We concluded that "[n]othing . . . but a different intent explains the different treatment." 521 U. S., at 329. This argument carried special weight because both chapters addressed similar issues: Chapter 153 established new standards for review of habeas corpus applications by state prisoners, and chapter 154 created new standards for review of habeas corpus applications by state prisoners under capital sentences. Because both chapters "govern[ed] standards affecting entitlement to relief" in habeas cases, "[i]f . . . Congress was reasonably concerned to ensure that chapter 154 be applied to pending cases, it should have been just as concerned about chapter 153." *Ibid.*

Because §§ 802 and 803 address wholly distinct subject matters, the same negative inference does not arise from the silence of § 803. Section 802 addresses "[a]ppropriate remedies" in prison litigation, prohibiting, for example, prospective relief unless it is "narrowly drawn" and is "the least intrusive means necessary to correct the violation." § 802(a), 18 U. S. C. § 3626(a)(1)(A) (1994 ed., Supp. III). That section also creates new standards designed to encourage the prompt termination of prospective relief or-

ders, providing, for example, for the "immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." §802(a), 18 U. S. C. §3626(b)(2). Section 803(d), by contrast, does not address the propriety of various forms of relief and does not provide for the immediate termination of ongoing relief orders. Rather, it governs the award of attorney's fees. Thus, there is no reason to conclude that if Congress was concerned that §802 apply to pending cases, it would "have been just as concerned" that §803 apply to pending cases.

Finally, we note that respondents' reliance on the legislative history overstates the inferences that can be drawn from an ambiguous act of legislative drafting. Even if respondents are correct about the legislative history, the inference that respondents draw from this history is speculative. It rests on the assumption that the *reason* the fees provisions were moved was to move them away from the language applying §802 to pending cases, when they may have been moved for a variety of other reasons. This weak inference provides a thin reed on which to rest the argument that the fees provisions, by negative implication, were intended to apply prospectively.

## B

Because we conclude that Congress has not "expressly prescribed" the proper reach of §803(d)(3), *Landgraf*, 511 U. S., at 280, we must determine whether application of this section in this case would have retroactive effects inconsistent with the usual rule that legislation is deemed to be prospective. The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about "whether the new provision attaches new legal

consequences to events completed before its enactment."
*Id.*, at 270. This judgment should be informed and guided
by "familiar considerations of fair notice, reasonable reliance,
and settled expectations." *Ibid.*

·1

For postjudgment monitoring performed before the ef-
fective date of the PLRA, the PLRA's attorney's fees
provisions, as construed by respondents, would have a retro-
active effect contrary to the usual assumption that congres-
sional statutes are prospective in operation. The attorneys
in both *Hadix* and *Glover* had a reasonable expectation that
work they performed prior to enactment of the PLRA in
monitoring petitioners' compliance with the court orders
would be compensated at the pre-PLRA rates as provided
in the stipulated order. Long before the PLRA was
enacted, the plaintiffs were declared prevailing parties, and
the parties agreed to a system for periodically award-
ing attorney's fees for postjudgment monitoring. The Dis-
trict Court entered orders establishing that the fees were to
be awarded at prevailing market rates, and specifically set
those rates, as relevant here, at $150 per hour. Respond-
ents' counsel performed a specific task—monitoring petition-
ers' compliance with the court orders—and they were told
that they would be compensated at a rate of $150 per hour.
Thus, when the lawyers provided these postjudgment moni-
toring services before the enactment of the PLRA, they
worked in reasonable reliance on this fee schedule. The
PLRA, as applied to work performed before its effective
date, would alter the fee arrangement *post hoc* by reducing
the rate of compensation. To give effect to the PLRA's
fees limitations, after the fact, would "attac[h] new legal con-
sequences" to completed conduct. *Landgraf, supra,* at 270.

Petitioners contest this conclusion. They contend that
the application of a new attorney's fees provision is "'un-
questionably proper,'" Brief for Petitioners 24 (quoting

*Landgraf, supra,* at 273), because fees questions "are incidental to, and independent from, the underlying substantive cause of action." They do not, in other words, change the substantive obligations of the parties because they are "collateral to the main cause of action." Brief for Petitioners 24–25 (quoting *Landgraf,* 511 U. S., at 277) (internal quotation marks omitted). Attaching the label "collateral" to attorney's fees questions does not advance the retroactivity inquiry, however. While it may be possible to generalize about types of rules that ordinarily will not raise retroactivity concerns, see, *e. g., id.,* at 273–275, these generalizations do not end the inquiry. For example, in *Landgraf,* we acknowledged that procedural rules may often be applied to pending suits with no retroactivity problems, *id.,* at 275, but we also cautioned that "the mere fact that a new rule is procedural does not mean that it applies to every pending case," *id.,* at 275, n. 29. We took pains to dispel the "sugges[tion] that concerns about retroactivity have no application to procedural rules." *Ibid.* See also *Lindh* v. *Murphy,* 521 U. S., at 327–328. When determining whether a new statute operates retroactively, it is not enough to attach a label (*e. g.,* "procedural," "collateral") to the statute; we must ask whether the statute operates retroactively.

Moreover, petitioners' reliance on our decision in *Bradley* v. *School Bd. of Richmond,* 416 U. S. 696 (1974), to support their argument that attorney's fees provisions can be applied retroactively is misplaced. In *Bradley,* the District Court had awarded attorney's fees, based on general equitable principles, to a group of parents who had prevailed in their suit seeking the desegregation of the Richmond schools. While the case was pending on appeal, Congress passed a statute specifically authorizing the award of attorney's fees for prevailing parties in school desegregation cases. The Court of Appeals held that the new statute could not authorize fee awards for work performed before the effective date of the new law, but we reversed, holding that the

fee award in that case was proper. Because attorney's fees were available, albeit under different principles, before passage of the statute, and because the District Court had in fact already awarded fees invoking these different principles, there was no manifest injustice in allowing the fee statute to apply in that case. *Id.*, at 720–721. We held that the award of statutory attorney's fees did not upset any reasonable expectations of the parties. See also *Landgraf, supra,* at 276–279 (distinguishing *Bradley* on these same grounds). In this case, by contrast, from the beginning of these suits, the parties have proceeded on the assumption that 42 U. S. C. § 1988 would govern. The PLRA was not passed until well after respondents had been declared prevailing parties and thus entitled to attorney's fees. To impose the new standards now, for work performed before the PLRA became effective, would upset the reasonable expectations of the parties.

2

With respect to postjudgment monitoring performed after the effective date of the PLRA, by contrast, there is no retroactivity problem. On April 26, 1996, through the PLRA, the plaintiffs' attorneys were on notice that their hourly rate had been adjusted. From that point forward, they would be paid at a rate consistent with the dictates of the law. After April 26, 1996, any expectation of compensation at the pre-PLRA rates was unreasonable. There is no manifest injustice in telling an attorney performing postjudgment monitoring services that, going forward, she will earn a lower hourly rate than she had earned in the past. If the attorney does not wish to perform services at this new, lower pay rate, she can choose not to work. In other words, as applied to work performed after the effective date of the PLRA, the PLRA has future effect on future work; this does not raise retroactivity concerns.

Respondents contend that the PLRA has retroactive effect in this context because it attaches new legal consequences

(a lower pay rate) to conduct completed before enactment. The preenactment conduct that respondents contend is affected is the attorney's initial decision to file suit on behalf of the prisoner clients. Brief for Respondents 29–31. Even assuming, *arguendo*, that when the attorneys filed these cases in 1977 and 1980, they had a reasonable expectation that they would be compensated for postjudgment monitoring based on a particular fee schedule (*i. e.*, the pre-PLRA, "prevailing market rate" schedule), respondents' argument that the PLRA affects pre-PLRA conduct fails because it is based on the assumption that the attorney's initial decision to file a case on behalf of a client is an irrevocable one. In other words, respondents' argument assumes that once an attorney files suit, she must continue working on that case until the decree is terminated. Respondents provide no support for this assumption, however. They allude to ethical constraints on an attorney's ability to withdraw from a case midstream, see Brief for Respondents 29 ("And finally, it is at that time that plaintiffs' counsel commit themselves ethically to continued representation of their clients to ensure that the Constitution is honored, a course of conduct that cannot lightly be altered"), but they do not seriously contend that the attorneys here were prohibited from withdrawing from the case during the postjudgment monitoring stage, see, *e. g.*, Tr. of Oral Arg. 42–43. It cannot be said that the PLRA changes the legal consequences of the attorneys' pre-PLRA decision to file the case.

## C

In sum, we conclude that the PLRA contains no express command about its temporal scope. Because we find that the PLRA, if applied to postjudgment monitoring services performed before the effective date of the Act, would have a retroactive effect inconsistent with our assumption that statutes are prospective, in the absence of an express command by Congress to apply the Act retroactively, we de-

cline to do so. *Landgraf*, 511 U. S., at 280. With respect to postjudgment monitoring performed after the effective date, by contrast, there is no retroactive effect, and the PLRA fees cap applies to such work. Accordingly, the judgment of the Court of Appeals for the Sixth Circuit is affirmed in part and reversed in part.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

Our task in this case is to determine the temporal application of that provision of the Prison Litigation Reform Act of 1995 (PLRA), 42 U. S. C. § 1997e(d)(3) (1994 ed., Supp. III), which prescribes that "[n]o award of attorney's fees in an action [brought by a prisoner in which attorney's fees are authorized under 42 U. S. C. § 1988 (1994 ed., and Supp. III)] shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U. S. C. § 3006A (1994 ed., and Supp. III)] for payment of court-appointed counsel."

I agree with the Court that the intended temporal application is not set forth in the text of the statute, and that the outcome must therefore be governed by our interpretive principle that, in absence of contrary indication, a statute will not be construed to have retroactive application, see *Landgraf* v. *USI Film Products*, 511 U. S. 244, 280 (1994). But that leaves open the key question: retroactive in reference to what? The various options in the present case include (1) the alleged violation upon which the fee-imposing suit is based (applying the new fee rule to any case involving an alleged violation that occurred before the PLRA became effective would be giving it "retroactive application"); (2) the lawyer's undertaking to prosecute the suit for which attorney's fees were provided (applying the new fee rule to any case in which the lawyer was retained before the PLRA became effective would be giving it "retroactive application");

(3) the filing of the suit in which the fees are imposed (applying the new fee rule to any suit brought before the PLRA became effective would be giving it "retroactive application"); (4) the doing of the legal work for which the fees are payable (applying the new fee rule to any work done before the PLRA became effective would be giving it "retroactive application"); and (5) the actual award of fees in a prisoner case (applying the new fee rule to an award rendered before the PLRA became effective would be giving it "retroactive application").

My disagreement with the Court's approach is that, in deciding which of the above five reference points for the retroactivity determination ought to be selected, it seems to me not much help to ask which of them would frustrate expectations. In varying degrees, they *all* would. As I explained in my concurrence in *Landgraf, supra,* at 286 (opinion concurring in judgments), I think the decision of which reference point (which "retroactivity event") to select should turn upon which activity the statute was intended to regulate. If it was intended to affect primary conduct, No. 1 should govern; if it was intended to induce lawyers to undertake representation, No. 2—and so forth.

In my view, the most precisely defined purpose of the provision at issue here was to reduce the previously established incentive for lawyers to work on prisoners' civil rights cases. If the PLRA is viewed in isolation, of course, its purpose could be regarded as being simply to prevent a judicial award of fees in excess of the referenced amount—in which case the relevant retroactivity event would be the award. In reality, however, the PLRA simply revises the fees provided for by § 1988, and it seems to me that the underlying purpose of *that* provision must govern its amendment as well—which purpose was to provide an appropriate incentive for lawyers to work on (among other civil rights cases) pris-

oner suits.[1] That being so, the relevant retroactivity event is the doing of the work for which the incentive was offered.[2] All work rendered in reliance upon the fee assurance contained in the former § 1988 will be reimbursed at those rates; all work rendered after the revised fee assurance of the PLRA became effective will be limited to the new rates. The District Court's announcement that it would permit future work to be billed at a higher rate operated *in futuro;* it sought to regulate future conduct rather than adjudicate past. It was therefore no less subject to revision by statute than is an injunction. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421, 436 (1856).

For these reasons, I concur in the judgment of the Court and join all but Part II-B of its opinion.

JUSTICE GINSBURG, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

I agree with the Court's determination that § 803(d) of the Prison Litigation Reform Act of 1995, (PLRA or Act), 42 U. S. C. § 1997e(d) (1994 ed., Supp. III), does not "limit fees for postjudgment monitoring performed before the [Act's] effective date," *ante,* at 347, and with much of the reasoning set out in Parts I, II-A-1, and II-B-1 of the Court's opinion. I disagree, however, with the holding that § 803(d) "limits attorney's fees with respect to postjudgment monitoring services performed after . . . the effective date." *Ibid.*

---

[1] Although the fees awarded under § 1988 are payable to the party rather than to the lawyer, I think it clear that the purpose of the provision was to enable the civil rights plaintiffs to offer a rate of compensation that would attract attorneys.

[2] I reject JUSTICE GINSBURG's contention that the retroactivity event should be the attorney's undertaking to represent the civil rights plaintiff. The fees are intended to induce not merely signing on (no time can be billed for that) but actually doing the legal work. Like the Court, I do not think it true that an attorney who has signed on cannot terminate his representation; he assuredly can if the client says that he will no longer pay the hourly fee agreed upon.

I do not find in the PLRA's text or history a satisfactory basis for concluding that Congress meant to order a midstream change, placing cases commenced before the PLRA became law under the new regime. I would therefore affirm in full the judgment of the Court of Appeals for the Sixth Circuit, which held §803(d) inapplicable to cases brought to court prior to the enactment of the PLRA. To explain my view of the case, I retread some of the factual and analytical ground treated in more detail in the Court's opinion.

I

On April 26, 1996, President Clinton signed the PLRA into law. Section 803(d) of the Act, governing attorney's fees, provides:

"(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that—

"(A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

"(B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

"(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

"(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

"(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater

than 150 percent of the hourly rate established under section 3006A of title 18 for payment of court-appointed counsel." 42 U. S. C. § 1997e(d) (1994 ed., Supp. III).

At issue here is whether § 803(d) governs post-April 26, 1996, fee awards in two lawsuits commenced before that date. In *Glover* v. *Johnson*, 478 F. Supp. 1075 (ED Mich. 1979), a class of female Michigan inmates filed an action under 42 U. S. C. § 1983 (1994 ed., Supp. III) against various Michigan prison officials (State) in 1977; the *Glover* plaintiffs alleged principally that they were denied vocational and educational opportunities afforded their male counterparts, in violation of the Equal Protection Clause. Ruling in plaintiffs' favor, the District Court entered a remedial order and retained jurisdiction over the case pending defendants' substantial compliance with that order. See *Glover* v. *Johnson*, 510 F. Supp. 1019, 1020 (ED Mich. 1981). Under a 1985 ruling governing fee awards, plaintiffs' counsel applied for fees and costs twice yearly. See *Hadix* v. *Johnson*, 143 F. 3d 246, 248 (CA6 1998).

In *Hadix* v. *Johnson*, a class of male Michigan inmates filed a § 1983 action against the State in 1980, alleging that the conditions of their confinement violated the First, Eighth, Ninth, and Fourteenth Amendments. In 1985, the parties entered into a consent decree governing sanitation, health care, fire safety, overcrowding, court access, and other aspects of prison life. The District Court retained jurisdiction over the case pending substantial compliance with the decree. Plaintiffs' attorneys remain responsible for monitoring compliance with the decree. In 1987, the District Court entered an order governing the award of fees and costs to plaintiffs' counsel for compliance monitoring. See *id.*, at 249.

Counsel for plaintiffs in both cases filed fee applications for compensation at the court-approved market-based level of $150 per hour for work performed between January 1, 1996, and June 30, 1996. See App. to Pet. for Cert. 27a, 33a. The

State objected, arguing that §803(d) limits all fees awarded after April 26, 1996, in these litigations to $112.50 per hour. *Id.*, at 34a. In separate but nearly identical opinions, the District Court refused to apply §803(d)'s fee limitation to work performed before the PLRA's effective date, see *id.*, at 28a, n. 1; *id.*, at 34a, n. 1, but applied the limitation to all work performed thereafter, see *id.*, at 31a, 41a.

Relying on its recent decision in *Glover* v. *Johnson*, 138 F. 3d 229 (1998), the Sixth Circuit affirmed the District Court's refusal to apply §803(d) to work completed pre-enactment. See 143 F. 3d, at 248. The appeals court reversed the District Court's judgment, however, to the extent that it applied §803(d) to work performed postenactment. See *id.*, at 255–256. Unpersuaded that Congress intended the PLRA attorney's fees provisions to apply retroactively, the panel held that §803(d) "is inapplicable to cases brought before the statute was enacted whether the underlying work was performed before or after the enactment date of the statute." *Ibid.*

## II

In *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994), we reaffirmed the Court's longstanding presumption against retroactive application of the law. "If [a] statute would operate retroactively," we held, "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*, at 280.

Emphasizing that §803(d) applies to "any action brought by a prisoner who is confined," the State insists that the statute's plain terms reveal Congress' intent to limit fees in pending as well as future cases. See Brief for Petitioners 14–15 (emphases deleted; internal quotation marks omitted). As the Court recognizes, however, §803(d)'s "any action brought" language refers to the provision's substantive scope, not its temporal reach, see *ante*, at 353–354; "any" appears in the text only in proximity to provisions identifying the

law's substantive dimensions.[1] Had Congress intended that § 803(d) apply retroactively, it might easily have specified, as the Court suggests, that all postenactment awards shall be subject to the limitation, see *ante,* at 354, or prescribed that the provision "shall apply in all proceedings pending on or commenced after the date of enactment of this Act." Congress instead left unaddressed § 803(d)'s temporal reach.

Comparison of § 803(d)'s text with that of a neighboring provision, § 802(b)(1) of the PLRA, is instructive for the retroactivity question we face. Section 802(b)(1), which governs "appropriate remedies" in prison litigation, applies expressly to "all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title." 110 Stat. 1321–70, note following 18 U. S. C. § 3626. "Congress [thus] saw fit to tell us which part of the Act was to be retroactively applied," *i. e.,* § 802. *Jensen* v. *Clarke,* 94 F. 3d 1191, 1203 (CA8 1996). While I agree with the Court that the negative implication created by these two provisions is not dispositive, see *ante,* at 357, Congress' silence nevertheless suggests that § 803(d) has no carryback thrust.

Absent an express statutory command respecting retroactivity, *Landgraf* teaches, the attorney's fees provision should not be applied to pending cases if doing so would "have retroactive effect." 511 U. S., at 280. As the Court recognizes, see *ante,* at 360, application of § 803(d) to work performed before the PLRA's effective date would be impermissibly retroactive. Instead of the court-approved

---

[1] Section 803(d) is thus unlike the unenacted provision discussed in *Landgraf* v. *USI Film Products,* 511 U. S. 244, 260 (1994), which would have made the statute at issue in that case applicable "'to all proceedings pending on or commenced after'" the effective date. Because this language would have linked the word "all" directly to the statute's temporal scope, we recognized that it might have qualified as a clear statement of retroactive effect. The word "any" is not similarly tied to the temporal scope of the PLRA, however, and so the inference suggested in the *Landgraf* discussion is not permissible here.

market-based fee that attorneys anticipated for work performed under the old regime, counsel would be limited to the new statutory rate. We long ago recognized the injustice of interpreting a statute to reduce the level of compensation for work already performed. See *United States* v. *Heth*, 3 Cranch 399, 408–409 (1806) (precluding, as impermissibly retroactive, application of a statute reducing customs collectors' commissions to customs collected before enactment, even when the commission was due after the statute's effective date).

## III

In my view, § 803(d) is most soundly read to cover all, and only, representations undertaken after the PLRA's effective date. Application of § 803(d) to representations commenced before the PLRA became law would "attac[h] new legal consequences to [an] even[t] completed before [the statute's] enactment"; hence the application would be retroactive under *Landgraf.* 511 U. S., at 270. The critical event effected before the PLRA's effective date is the lawyer's undertaking to prosecute the client's civil rights claim. Applying § 803(d) to pending matters significantly alters the consequences of the representation on which the lawyer has embarked.[2] Notably, attorneys engaged before passage of the PLRA have little leeway to alter their conduct in response to the new legal regime; an attorney who initiated a prisoner's rights suit before April 26, 1996, remains subject to a professional obligation to see the litigation through to final disposition. See ABA Model Rule of Professional Conduct 1.3, and Comment [3] (1999) ("[A] lawyer should carry

---

[2] An attorney's decision to invest time and energy in a civil rights suit necessarily involves a complex balance of factors, including the likelihood of success, the amount of labor necessary to prosecute the case to completion, and the potential recovery. Applying § 803(d) to PLRA representations ongoing before April 26, 1996, effectively reduces the value of the lawyer's prior investment in the litigation, and disappoints reasonable reliance on the law in place at the time of the lawyer's undertaking.

through to conclusion all matters undertaken for a client."). Counsel's actions before and after that date are thus "inextricab[ly] part of a course of conduct initiated prior to the law." *Inmates of D. C. Jail* v. *Jackson,* 158 F. 3d 1357, 1362 (CADC 1998) (Wald, J., dissenting).

While the injustice in applying the fee limitations to pending actions may be more readily apparent regarding work performed before the PLRA's effective date, application of the statute to work performed thereafter in pending cases also frustrates reasonable reliance on prior law and court-approved market rates. Consider, for example, two attorneys who filed similar prison reform lawsuits at the same time, pre-PLRA. Both attorneys initiated their lawsuits in the expectation that, if they prevailed, they would earn the market rate anticipated by pre-PLRA law. In one case, the lawsuit progressed swiftly, and labor-intensive pretrial discovery was completed before April 26, 1996. In the other, the suit lagged through no fault of plaintiff's counsel, pending the court's disposition of threshold motions, and the attorney was unable to pursue discovery until after April 26, 1996.[3] Both attorneys have prosecuted their claims with due diligence; both were obliged, having accepted the representations, to perform the work for which they seek compensation. There is scarcely greater injustice in denying pre-PLRA compensation for pretrial discovery in the one case than the other. Nor is there any reason to think that Congress intended these similarly situated attorneys to be treated differently.

The Court avoids a conclusion of retroactivity by dismissing as an unsupported assumption the attorneys' assertion of an obligation to continue their representations through to

---

[3] If counsel's conduct caused delay or protraction, the court could properly exercise discretion to deny or reduce the attorney's fee. See 42 U. S. C. § 1988(b) (1994 ed., Supp. III) ("[T]he court, in its discretion, may allow . . . a reasonable attorney's fee.").

final disposition. See *ante*, at 361. It seems to me, however, that the assertion has secure support.

Like the ABA's Model Rules, the Michigan Rules of Professional Conduct (1999), which apply to counsel in both *Hadix* and *Glover*, see Rule 83.20(j), provide that absent good cause for terminating a representation, "a lawyer should carry through to conclusion all matters undertaken for a client." Rule 1.3, Comment. It is true that withdrawal may be permitted where "the representation will result in an unreasonable financial burden on the lawyer," Rule 1.16(b)(5), but explanatory comments suggest that this exception is designed for situations in which "the client refuses to abide by the terms of an agreement relating to the representation, such as an agreement concerning fees," Rule 1.16, Comment. Consistent with the Michigan Rules, counsel for petitioners affirmed at oral argument their ethical obligation to continue these representations to a natural conclusion. See Tr. of Oral Arg. 43 ("[Continuing the representation] does involve ethical concerns certainly, especially in the[se] circumstance[s]."). There is no reason to think counsel ethically could have abandoned these representations in response to the PLRA fee limitation, nor any basis to believe the trial court would have permitted counsel to withdraw. See Rule 1.16(c) ("When ordered to do so by a tribunal, a lawyer shall continue representation."). As I see it, the attorneys' pre-PLRA pursuit of the civil rights claims thus created an obligation, enduring post-PLRA, to continue to provide effective representation.

Accordingly, I conclude that the Sixth Circuit soundly resisted the "sophisticated construction," 143 F. 3d, at 252, that would split apart, for fee award purposes, a constant course of representation. "[T]he triggering event for retroactivity purposes," I am persuaded, "is when the lawyer undertakes to litigate the civil rights action on behalf of the client." *Inmates of D. C. Jail*, 158 F. 3d, at 1362 (Wald, J., dissenting).

\* \* \*

*Landgraf*'s lesson is that Congress must speak clearly when it wants new rules to govern pending cases. Because § 803(d) contains no clear statement on its temporal reach, and because the provision would operate retroactively as applied to lawsuits pending on the Act's effective date, I would hold that the fee limitation applies only to cases commenced after April 26, 1996.